IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SCOTT JAMES HAID                                                    PLAINTIFF

      v.                        Civil No.  14-5119

SHERIFF KELLEY CRADDUCK;
NURSE DARLA WATSON; DEPUTY
A. THOMPSON; and DEPUTY
PITTS                                                              DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action brought by the Plaintiff pursuant to 42 U.S.C. § 1983.  The

Plaintiff proceeds *pro se* and *in forma pauperis.*

The claims at issue in this case occurred while the Plaintiff was incarcerated in the

Benton County Detention Center (BCDC) located in Bentonville, Arkansas.  Plaintiff is currently

incarcerated in the Arkansas Department of Correction (ADC), East Arkansas Regional Unit, in

Marianna, Arkansas.

While at the BCDC, Plaintiff contends his civil rights were violated in the following

ways:  he was denied adequate medical care; his right to privacy was violated; and Defendants

failed to provide him an adequate diabetic diet.  On October 2, 2015, the Defendants filed a

Motion for Summary Judgment (Doc. 38).  A hearing was scheduled for November 17, 2015,

to allow the Plaintiff to respond orally to the Motion.  Plaintiff filed a written response on

November 10, 2015.  He appeared by video on November 17th and responded orally to the

Motion.  The Motion is now before the Court for issuance of this report and recommendation.

-1-

## 1.  Background

Plaintiff was booked into the BCDC on June 24, 2013.  Doc. 40-2 at 2.[1]  He remained incarcerated there until June 16, 2014, when he was transferred to the ADC.

When he was booked in, a medical questionnaire was completed.  Doc. 40-2 at 5.  The questionnaire indicated that Plaintiff had diabetes, high blood pressure, high cholesterol, and was suffering from "horrible back pain."  *Id.*  Plaintiff testified that the booking deputy did not list all his medical conditions on the questionnaire. Plaintiff indicated he was taking metformin,[2] lisinopril,[3] and prestat.[4]  *Id; see also* Doc. 40-4 at 20-21.  However, he was not evaluated by medical personal at intake.  Doc. 40-2 at 5.

Plaintiff testified that he had serious medical conditions including diabetes, back problems, a history of transient ischaemic attacks (TIAs), a history of blood clots in his legs, and osteoarthritis.  With respect to his back, Plaintiff testified he injured it when he slipped and fell in 1999.  *See also* Doc. 40-4 at 9 & 15.   He has not undergone surgery on his back but has undergone a series of spinal injections.  *Id.* at 17.  Since 2003, he has not undergone any medical procedures with respect to his back.  *Id.*  He was treated with pain medication during 2004 and/or 2005.  *Id.*  After that, he just "dealt with it" by using over-the-counter medication such as Tylenol or Aleve  *Id.* at 17-18.

---

[1] This Document is Defendants' Exhibit A containing the Plaintiff's jail medical file.  For ease in finding the pages referred to, the Court will cite to the CM/ECF page number contained in the header of each page.

[2] Metformin is used to treat type 2 diabetes.  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (accessed December 17, 2015).

[3] Lisinopril is used to treat high blood pressure.  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html (accessed December 17, 2015).

[4] Presumably pravastatin.  Pravastatin is used together with diet, weight-loss, and exercise to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease."  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a692025.html (accesssed December 18, 2015).

To verify this information, Plaintiff states the medical staff merely needed to contact his doctor.  Plaintiff testified his prescriptions had been written just a matter of days prior to his arrest.  Plaintiff was not aware of how, or when, the medical questionnaires were provided to, and reviewed by, medical staff.

On June 28, 2013, Plaintiff's was prescribed lisinopril, metformin, pravastatin, citalopram, aspirin, and fiber.  Doc. 42-2 at 9.  Plaintiff's medication records indicate that at various times he was also prescribed omeprazole, coumadin/warfarin, lovenox, and pain medication including Tramadol HCL and acetaminophen, Doc. 40-2 at 19-38.

Plaintiff maintains his privacy rights were violated when he and another inmate were taken to a urologist.  Doc. 40-2 at 140.  Both the guard and the other inmate were present in the room during Plaintiff's examination and when his medical condition was discussed. *Id.*  Plaintiff also indicates that his medical history was on the computer screen and could be seen by others. *Id.*

Plaintiff testified he requested an extra mat because he was afraid of getting another blood clot.  According to Plaintiff, he was told he would not be accommodated.  The following morning, June 25, 2013, at pill call, he spoke to Nurse Watson who listened but then told him to submit a written request via the kiosk system.  Nurse Watson also stated that they did not accommodate old conditions.

From June 24, 2013, until November 14, 2013, Plaintiff only had a single mat.  Plaintiff states he was informed that medical staff had to authorize a second mat but when he talked to medical personnel they would advise his to talk to the sergeant.  When he would talk to the sergeant, Plaintiff testified he was told a second mat had to be ordered by medical staff.  Plaintiff

-3-

testified he continued to get this run around until finally, on November 14th, Deputy Rosser looked up Plaintiff's file and gave him a second mat.  However, even after this, Plaintiff stated that other BCDC personnel would take the mat away and tell him it had to be ordered by medical personnel.  Doc. 40-2 at 146.  Plaintiff testified that a second mat had to be reordered approximately thirteen times.  *See e.g.,* Doc. 40-2 at 153,155.  Plaintiff believes not having a second mat for almost five months caused his to have a blood clot.

Plaintiff testified the Defendants refused to contact his primary care physician, Dr. David Masurski, in Wisconsin;  or the physician, Dr. Joel Fankhauser, Plaintiff began seeing in Arkansas in 2009.  It was Dr. Fankhauser who advised the Plaintiff not to sleep on hard surfaces. Plaintiff points out that he even provided Nurse Watson with Dr. Fankhauser's phone number. *See* Doc. 42 at 44, 46.

Plaintiff first submitted a medical request about his right testicle being swollen and painful on November 14, 2013.  Doc. 42 at 49.  He also stated that he had a lump on his right thigh, right chest, and left arm.  *Id.*  With respect to the problem with his testicle, Plaintiff indicated he thought it might be a hydrocele.[5]  *Id.*  Plaintiff testified the testicle had been slightly swollen for eight or nine months but had only been painful for the last ten to fifteen days.  *Id.* In February or March of 2013, Dr. Fankhauser felt a small lump in Plaintiff's right testicle and said it might be a hydrocele.

On November 19, 2013, Plaintiff was informed that he would be put on "doctor call." Plaintiff was seen by Dr. Lafferty on the following day.   Doc. 40-2 at 8.  Plaintiff testified that

---

[5]A hydrocele is a "collection of serous fluid in a sacculated cavity; specifically, such a collection in the space of the tunica vaginalis testis, or in a separate pocket along the spermatic cord." http://www.medilexicon.com/medicaldictionary.php?t=41867 (accessed December 17, 2015).

Dr. Lafferty indicated it could by a hydrocele but that the jail probably would not do anything about it since the condition was usually not painful. An ultrasound was ordered for the right testicle, the right thigh, and the left arm. *Id.* Dr. Lafferty indicated he would monitor the condition. *Id.*

On December 12, 2013, Plaintiff was taken to Mercy Medical for the ultrasounds. Doc. 40-2 at 39. An ultrasound was done on Plaintiff's testicle, his thigh, and his left arm. The ultrasound of his testicle showed a "large right-sided hydrocele." Doc. 40-2 at 46. A small "left-sided hydrocele was also seen." *Id.* at 47. The ultrasound of his right thigh revealed a "well-circumscribed oval isoechoic mass subcutaneous fat most consistent with a small lipoma." *Id.* at 62. The ultrasound of his left arm revealed a "round hyperechoic intramuscular mass within the right triceps muscle." *Id.* at 75.

No ultrasound was performed on the mass on Plaintiff's chest. Doc. 40-2 at 127. On December 13, 2013, Plaintiff requested that the ultrasound of his chest be taken. *Id.* Nurse Watson merely responded that the ultrasounds were done and that Dr. Lafferty would be his physician. *Id.* She did not mention having an ultrasound done on the mass on his chest. *Id.* When Plaintiff submitted another request on December 16, 2013, regarding an ultrasound on his chest, Nurse Watson indicated the doctor wanted to watch it and if it got bigger Plaintiff was to let her know. *Id.* at 128. She also noted that there was only one urologist who would see prisoners and that he did not have an opening until April 2014 but she would continue to try and get an appointment. *Id.*

Plaintiff was seen by Dr. Lafferty and Nurse Watson on December 17, 2013. Doc. 40-2 at 8. Dr. Lafferty noted that the ultrasound showed a large hydrocele in the Plaintiff's right

-5-

testicle. *Id.*   Dr. Lafferty further noted that the other masses had not changed size and the ultrasound revealed that the mass on the left arm was a probable lipoma.[6]  *Id.*  Dr. Lafferty indicated he would monitor the masses and he referred the Plaintiff to a urologist with respect to the hydrocele.  *Id.*

On December 21, 2013, Plaintiff complained that the pain in his right testicle was getting worse.  Doc. 40-2 at 132.  Plaintiff requested stronger pain medication, a medical mat, and extra bed rest.  *Id.*  Nurse Watson responded that he had several pain medications, a mat had been ordered, and he already had extra bed rest.  *Id.*  Further, she said if Plaintiff needed surgery, it would happen.  *Id.*

According to Dr. Lafferty, hydroceles are typically painless.  Doc. 40-6 at 1.  "They can be drained with a needle or minor surgery, but often resolve without treatment."  *Id.*

Plaintiff was seen by a urologist, Dr. Zimmerman, on January 24, 2014.  Doc. 40-2 at 84.  Dr. Zimmerman determined that Plaintiff had a large right-sided hydrocele and a small left-side hydrocele.  *Id.* at 86.  Dr. Zimmerman believed the best course of action was do a "Bilateral hydrocele repair" even though Plaintiff's symptoms were primarily right-sided.  *Id.*  Plaintiff was to continue scrotal support and rest.  *Id.*  Nurse Watson  noted in Plaintiff's chart that he would need bilateral hydrocele surgery. Doc. 40-2 at 13.  However, Plaintiff testified that surgery was not scheduled and there was no discussion as to when it should be scheduled.

On February 12, 2014, Plaintiff was seen at Mercy Hospital Northwest and was diagnosed with a "[p]artially occlusive deep vein thrombosis involving the left popliteal vein."

---

[6]A lipoma is a "benign neoplasm of adipose tissue, composed of mature fat cells."  http://www.medilexicon.com/medicaldictionary.php?t=50801 (accessed December 17, 2015).

-6-

Doc. 40-2 at 96.  On February 18, 2014, Dr. Zimmerman's office called to scheduled the surgery. *Id.*  However, they were advised that Plaintiff had a DVT and was on Coumadin.  *Id.*  Nurse Watson wrote "will call when off Coumadin." *Id.*  In Dr. Lafferty's opinion, the surgery was elective.  Doc. 40-6 at 2.

Plaintiff was seen on March 14, 2014, complaining of a spot on his leg.  It was believed to be a blood clot and Plaintiff was put on Coumadin, an anticoagulant.  In late April of 2014, Plaintiff complained that the pain in his groin was getting worse.  Doc. 40-2 at 157.  He complained it really hurt and he believed the swelling was spreading. *Id.*

Plaintiff was seen on May 9, 2014, complaining of swelling and discomfort in his right scrotum.  Doc. 40-2 at 8.  Examination revealed a large hydrocele. *Id.*  Plaintiff was again referred to Dr. Zimmerman "to see if he had another possible option such as needle aspiration." Doc. 40-6 at 2.

With respect to his diet, Plaintiff testified he was placed on a diabetic diet on July 1, 2013.  Doc. 40-2 at 9.  However, he maintains that the trays he received did not comply with the diabetic diet.  He testified that he was given the same tray all inmates received.  Plaintiff made numerous complaints about various items on his tray and not receiving an appropriate diabetic diet. *Id.* at 120, 122, 125-126, 133, 135, 141.  He complained that if they could not do a better job on the diabetic tray they might as well give diabetics regular trays. *Id.* at 122 & 134.  Nurse Watson responded that Plaintiff should address these issues with the dietary supervisor. *Id.* at 134.  Plaintiff was advised that only medical personnel could take him off the diabetic diet. *Id.* at 136.  On September 25, 2013, Plaintiff was prescribed a diabetic bedtime snack. *Id.* at 8.

**2.  Applicable Standard**

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995).  The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).

The Court must view all evidence and inferences in a light most favorable to the nonmoving party.  *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**3.  Discussion**

**(A).  Right to Adequate Medical Care**

"Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished."  *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989)(*citing Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  The Eighth Amendment deliberate indifference standard

applies to all denial of medical care claims.  *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012).  The deliberate indifference standard has both an objective and a subjective component.  *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997).

"An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Jones v. Minnesota Dep't of Corrections*, 512 F.3d 478, 481 (8th Cir. 2008)(internal quotation marks and citation omitted).

To prevail on his claim, Plaintiff must demonstrate that (1) he suffered an objectively serious medical need; and (2) the defendant actually knew of the medical need but, subjectively, was deliberately indifferent to it.  *Grayson v. Ross*, 454 F.3d 802, 808-09 (8th Cir. 2006).

"Deliberate indifference is equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate."  *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011)(internal quotation marks and citation omitted).   The deliberate indifference standard is not met by the exercise of professional judgment in refusing to implement an inmate's requested course of treatment.  *Vaughn v. Gray*, 557 F.3d 904, 908-09 (8th Cir. 2009).   Nor is the standard met by demonstrating a doctor committed medical malpractice.  *Jackson v. Buckman*, 756 F.3d 1060, 1065-66 (8th Cir. 2014).  Keeping these principles in mind, I turn to an examination of the facts of this case.

### (B).  Official Capacity Claim

Here, Plaintiff's official capacity claims are based on the alleged inadequacies in the BCDC's intake procedures and inadequacies in the diabetic diet.  A Plaintiff "seeking to impose

-9-

liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997). "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009)(citation omitted). With respect to his medical care, Plaintiff has not pointed to "any officially accepted guiding principle or procedure that was constitutionally inadequate." *Jenkins v. County of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009). Merely alleging that procedures were not followed or were inadequate in some way is insufficient. *Id*. Plaintiff has not pointed to a "deliberate choice of a guiding principle or procedure made by the municipal official who has final authority in such matters." *Id*.

"[A] custom can be shown only by adducing evidence of a continuing, widespread, persistent pattern of unconstitutional misconduct." *Id*. at 634 (internal quotation marks and citation omitted). There is no genuine issue of material fact as to whether there is any widespread, persistent pattern of unconstitutional conduct with respect to the intake screening procedures. The undisputed facts show that the medical information Plaintiff provided on being booked was given to medical personnel and he was evaluated by a nurse the following day. Clearly, this falls far short of suggesting the existence of an unconstitutional policy, custom, or practice.

However, there is a genuine issue of material fact as to whether or not diabetics were provided with meals sufficient to maintain there health. "The Eighth Amendment prohibits

-10-

punishments that deprive inmates of the minimal civilized measure of life's necessities." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996); *see also Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)("[I]n this circuit, the standards applied to Eighth Amendment and Fourteenth Amendment claims have been the same").   Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities. Prison conditions claims include threats to an inmate's health and safety. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

Here, Plaintiff maintains the diabetic trays did not differ from the trays served to other inmates, contained food diabetics were supposed to avoid, and caused him to lose weight rapidly. Doc. 40-4 at 51.  Specifically, Plaintiff states he went from 248 pounds to 204 pounds in a couple of months.  *Id.*  The rapid weight lose did not stop until the nurse put him on a high protein peanut butter tray, gave him extra snacks, and extra food on his tray.  *Id.* at 51-52.   Benton County does not insulate itself from a claim that it has a custom, policy, or practice of failing to provide medically necessary diets to inmates by contracting with a food service provider.  *See e.g., Toombs v. Bell*, 915 F.2d 345 (8th Cir. 1990)("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical care to those in its custody")(citation and internal quotation marks omitted).

### (C).  Sheriff Cradduck--Individual Liability Claims

The Plaintiff's allegations against Sheriff Helder are totally conclusory. Plaintiff has not asserted any factual basis for a claim against the sheriff except for his overall responsibility for the jail and for having a trained staff.  Nothing in the record before the Court suggests any personal involvement by Sheriff Cradduck in any alleged constitutional violations. Instead,

-11-

Plaintiff merely makes broad assertions that the sheriff did not have proper intake screening procedures, did not train his deputies in regard to inmate privacy rights, and failed to ensure that a proper diabetic diet was served.

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability. *See Monell v. Department of Social Services*, 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone County Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted); *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability").

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (*quoting Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)).

There are no allegations that Sheriff Cradduck was involved in anyway with the decision of whether the Plaintiff should receive medical treatment, when he should receive medical treatment, what type of treatment he should receive, or in determining what the diabetic diet trays should consist of. Plaintiff did not communicate in anyway with Sheriff Cradduck regarding his

-12-

grievances or complaints about the lack of medical care, the contents of the diabetic tray, or the release of his medical information. No plausible individual capacity claim has been stated against Sheriff Cradduck. This finding makes it unnecessary to determine if Sheriff Cradduck would be protected by qualified immunity.

### (D).  Right to Privacy and/or Maintain Confidentiality of Medical Information

Deputy Pitts was the officer who took the Plaintiff to Dr. Zimmerman's office. Doc. 40-4 at 33. According to Plaintiff, Deputy Pitts demanded that he and Inmate Morris stay in the examination room. *Id.* This is true even though the doctor offered to take the inmates one at a time in separate examination rooms. *Id.* at 35. During the examination, Plaintiff indicates he was exposed from the waist down. *Id.* at 34. Plaintiff also indicated that Dr. Zimmerman verbally went over the Plaintiff's entire medical history. *Id.* at 35.

With respect to Deputy Thompson, Plaintiff testified that on February 10, 2014, he told the Plaintiff he was no longer on bed rest. Doc. 40-4 at 46. When Plaintiff protested, Deputy Thompson called Nurse Watson. *Id.* Reportedly, Nurse Watson told Deputy Thompson that Plaintiff's pain level should not be so high. *Id.* at 47. Plaintiff believes Nurse Watson told the deputy what medical condition he had. *Id.* at 47-48. Plaintiff believes Deputy Thompson passed this information onto Deputy Wilkins who made fun of the Plaintiff the following day. *Id.* at 48. By the process of elimination, Plaintiff testified he knew that this was how Deputy Wilkins "could have found out what was wrong with me." *Id.*

Defendants correctly point out that Plaintiff's claims under Health Insurance Portability and Accountability Act (HIPAA) fail. "HIPAA does not create a private right of action." *Dodd*

-13-

*v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010).   However, a constitutional right to privacy with respect to medical information exists.  *Whalen v. Roe*, 429 U.S. 589, 599 (1977).

I find the claim against Deputy Thompson is too tenuous to proceed.  Plaintiff only makes the conclusory allegations that she passed confidential information on to another deputy.

Even if Nurse Watson and Deputy Pitts did disclose Plaintiff's medical condition, they maintain they are entitled, in their individual capacities, to qualified immunity on this issue. They contend their actions did not violate any clearly established constitutional rights of the plaintiff.

"Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir. 2001)(*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The defense applies to individual capacity claims only.  *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006).

"The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224 (1991)(*quoting, Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).  The inquiry is normally one of pure law.  *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

"The determination of whether a state actor is entitled to the protection of qualified immunity is a two-step process." *Washington v. Normandy Fire Protection Dist.*, 272 F.3d 522, 526 (8th Cir. 2001).  First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendants'] conduct violated a

-14-

constitutional right." *Saucier v. Katz*, 533 U.S. 194 (2001).  Second, the court must determine

if the right was clearly established.  *Washington*, 272 F.3d at 256.

In *Whalen v. Roe*, 429 U.S. 589, 599 (1977), the Court discussed a constitutionally

protected "zone of privacy" involving two different kinds of interests.  *Id.*, 429 U.S. at 598-599.

The first "is the individual interest in avoiding disclosure of personal matters, and another is the

interest in independence in making certain kinds of important decisions."  *Id.* at 599.

Following *Whalen*, the courts have recognized a constitutionally protected right of

individuals to avoid disclosure of personal matters including medical information.  This right has

been variously characterized as the right to confidentiality or the right to privacy.  *See e.g.,*

*Cooksey v. Boyer*, 289 F.3d 513, 515-516 (8th Cir. 2002).  However, as pointed out by the Eighth

Circuit in *Cooksey* "[n]ot every disclosure of personal information will implicate the

constitutional right to privacy."  *Id.*, 289 F.3d at 516.  It noted it had "consistently held that to

violate the constitutional right of privacy the information disclosed must be either a shocking

degradation or an egregious humiliation . . . to further some specific state interest, or a flagrant

bre[a]ch of a pledge of confidentiality which was instrumental in obtaining the personal

information."  *Id.*  (citations and internal quotation marks omitted).   This right extends to

medical test results, medical records, and medical communications.  *See Ferguson v. City of*

*Charleston*, 532 U.S. 67, 78 (2001)(individuals have a reasonable expectation of privacy in

medical test results and that those results will not be shared with nonmedical personnel without

the patient's consent).

With respect to those who are detained, it has been held that although "prisoners do not

shed all constitutional rights at the prison gate, . . . lawful incarceration brings about the

-15-

necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Sandin v. Conner*, 515 U.S. 472 (1995).   A number of cases have addressed the issue of the right to privacy of medical information in the prison context.  For example, in *Doe v. Delie*, 257 F.3d 309 (3d Cir. 2001), the Third Circuit held that "the Fourteenth Amendment protected an inmate's right to medical privacy, subject to legitimate penological interests.. . . Moreover, a prisoner's right to privacy in this medical information is not fundamentally inconsistent with incarceration." *Id.*, 257 F.3d at 311, 317. This right is not co-extensive to that of free citizens.  *Id.*  Instead, the right is subject to substantial restrictions.  *Id.; see also Cooksey v. Boyer*, 289 F.3d 513, 515-15 (8th Cir. 2002)(while the right to privacy exists, not every disclosure of personal information will implicate the constitutional right to privacy); *Beers v. Stockton*, 242 F.3d 373 (8th Cir. 2000)(unpublished *per curiam*)(privacy rights not violated when release of medical information was for purposes of continuity of care and related to penological concerns); *Richey v. Ferguson*, Civil No. 05-5162, 2007 WL 710129 (W.D. Ark. March 6, 2007).

Taken in the light most favorable to the Plaintiff, I believe the facts alleged show Nurse Watson and Deputy Pitts violated a constitutional right.  The right to privacy extends to medical examinations and communications with the doctor.

The right to privacy with respect to medical information was well established by 2013. Under the circumstances of this case, Nurse Watson and Deputy Pitts are not entitled to qualified immunity.

-16-

### (E).  Nurse Watson--Denial of Medical Care

I believe there are genuine issues of material fact as to whether Nurse Watson exhibited deliberate indifference to the Plaintiff's serious medical needs.  On January 24, Dr. Zimmermann recommended surgical repair of the hydrocele.  Nothing was done to schedule the surgery.  Then in February when contacted by Dr. Zimmermann's office, Nurse Watson indicated no surgery could be performed because of the blood clot.  Once the blood clot issue was resolved, she took no steps to schedule the surgery despite Plaintiff's continued complaints of severe pain.  Further, Plaintiff testified at his deposition that Inmate Morris, who saw Dr. Zimmerman for the same condition on January 24th, had his surgery prior to the time Plaintiff developed the blood clot.  Doc. 40-4 at 41.  Plaintiff asserts Nurse Watson didn't even attempt to make his appointment for surgery during this period of time.  *Id.*  He believed she was playing games.  *Id.*

Further, when Plaintiff asked Nurse Watson why he couldn't be taken off blood thinners for three or four days to have his surgery, Nurse Watson responded that was not going to happen.  Doc. 40-4 at 43-44.   Instead, she asked when his criminal case was going to be over and said that Benton County would not do the surgery due to the cost.  *Id.* at 44 & 69.

Plaintiff testified that he is currently on the list at the ADC to have the surgery done.  *Id.*  Because the surgery was not done early enough, Plaintiff testified he has suffered permanent nerve damage.  *Id.* at 57.

Under the Eighth Amendment's proscription against cruel and unusual punishments,' prison officials are obligated to provide "inmates in their custody with medical care."  *Plemmons v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006).  The duty to provide medical care is one arising out of the Eighth Amendment of the United States Constitution.  Regardless, of the terms of the

-17-

Defendants' contract with the ADC, if an inmate in defendants' custody needs care it must be provided.  *See e.g., Toombs v. Bell*, 915 F.2d 345 (8th Cir. 1990)("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical care to those in its custody.")(citation and internal quotation marks omitted).  There is a question of fact whether Nurse Watson's actions were motivated by cost rather than medical judgment.

Additionally, I believe there is a genuine issue of material fact as to whether Nurse Watson exhibited deliberate indifference to Plaintiff's serious medical needs when she failed to approve the Plaintiff for a second mat.  Plaintiff contends Nurse Watson flatly stated they would not accommodate his request.

### 4.  Conclusion

For the reasons stated, I recommend that Defendants' Motion for Summary Judgment (Doc. 38) be **DENIED IN PART AND GRANTED IN PART.**  Specifically, the Motion should be **GRANTED** with respect to the following claims: (1) all claims against Deputy Thompson; (2) the individual capacity claims against Sheriff Cradduck; and (3) all claims related to the alleged inadequacies in intake screening procedures.

The Motion should be **DENIED** with respect to the following claims: (1) Plaintiff's official capacity claim against Sheriff Cradduck regarding the provision of diabetic food trays; (2) the violation of the right to privacy against Nurse Watson and Deputy Pitts; and (3) the individual liability denial of medical care claim against Nurse Watson.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties**

-18-

**are reminded that objections must be both timely and specific to trigger de novo review by**

**the district court.**

DATED this 21st day of December 2015.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-19-