## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**SCOTT JAMES HAID**                                                      **PLAINTIFF**

v.                                    **Case No. 5:14-cv-5119**

**SHERIFF KELLY CRADDUCK;**
**NURSE DARLA WATSON; DEPUTY**
**A. THOMPSON; and DEPUTY**
**PITTS**                                                                 **DEFENDANTS**

### OPINION AND ORDER

Presently before the Court is the Report and Recommendations ("R&R") (Doc.

44) filed in this case by the Honorable James R. Marschewski, United States Magistrate

Judge for the Western District of Arkansas. The R&R advises the Court to dismiss

several of Plaintiff Scott Haid's claims on summary judgment, and to allow three of his

claims to proceed. Defendants filed Objections to the R&R (Doc. 45) on December 29,

2015, to which Haid responded on January 22, 2016 (Doc. 46). Haid did not file any

objections to the R&R. After reviewing the record *de novo* and considering Defendants'

objections, the Court **ADOPTS IN PART AND DECLINES TO ADOPT IN PART** the

Magistrate Judge's R&R.

### I.    BACKGROUND

The facts of this case are ably set out in the R&R and require no more than a

brief recounting here. Haid's Complaint alleges that he has a series of medical

conditions including diabetes, back pain, a hydrocele on his testicles, a history of

transient ischaemic attacks, and a history of blood clots in his legs. According to Haid,

Defendants violated his constitutional rights when he was incarcerated at a Benton

County Department of Corrections ("BCDC") facility awaiting trial on certain criminal

1

charges. Specifically, Haid contends that Defendants violated his Eighth Amendment right against cruel and unusual punishment by failing to provide adequate medical care for his conditions, including by failing to provide him with an adequate diabetic diet. Haid also asserts violations of his Fourteenth Amendment privacy rights stemming from a urologist's appointment, and a nurse's conversation with a guard.

Defendants moved for summary judgment on all of Haid's claims on October 2, 2015 (Doc. 38). The R&R suggests dismissing Haid's individual capacity claims against Sheriff Cradduck, right to privacy claim against Deputy Thompson, and official capacity claims based on alleged inadequacies in BCDC's intake procedures. It recommends keeping, however, Haid's official capacity claim related to diabetic meals, right to privacy claims against Nurse Watson and Deputy Pitts, and denial of medical care claims against Nurse Watson. For the reasons discussed below, the Court adopts the R&R with respect to Haid's diabetic meals claim, declines to adopt the R&R with respect to his right to privacy claims against Nurse Watson and Deputy Pitts, adopts in part and declines to adopt in part the R&R with respect to his denial of medical care claims against Nurse Watson, and adopts the remainder of the R&R.

## II.    SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the

2

absence of any material factual disputes. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

## III.    DISCUSSION

### A.    Haid's Official Capacity Diabetic Meals Claim

The Court agrees with the R&R's conclusion that genuine issues of material fact exist as to whether BCDC provided Haid with diabetic meals sufficient to maintain his health. While the Magistrate Judge's reasoning on this matter is sound, the Court writes on to explain its somewhat more nuanced views of the legal standard and factual issues in this case.

Haid's claim involves components of both an inadequate medical care allegation, and an inadequate condition of confinement allegation. That is, diabetes is a medical condition, one aspect of the treatment for which involves a specialized diet. And, the

3

dietary options provided by a prison constitute a condition of confinement. While these two categories of allegations have been treated by courts as formally distinct, the legal standard for proving a constitutional violation for each revolves around the same concept: deliberate indifference.

To elaborate, "[d]eliberate indifference by prison personnel to an inmate's serious medical needs violates the inmate's eighth amendment right to be free from cruel and unusual punishment." *Smith v. Jenkins*, 919 F.2d 90, 92 (8th Cir. 1990); *see also Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976).[1] To establish deliberate indifference, "an inmate must show (1) that he suffered objectively serious medical needs and (2) that the prison official actually knew of but deliberately disregarded those needs." *Plemmons v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006) (quotations and alterations omitted). With respect to the first prong, "[a]n objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jones v. Minn. Dep't of Corrs.*, 512 F.3d 478, 481 (8th Cir. 2008) (quotation omitted). With respect to the second, deliberate disregard "is equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Schaub v. VonWald*, 638 F.3d 905, 914-15 (8th Cir. 2011) (quotation omitted).

The standard is effectively the same for conditions of confinement. As the Supreme Court has explained, there is "no significant distinction between claims

---

[1] This principle applies equally to pretrial detainees through the Fourteenth Amendment. *See Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007).

4

alleging inadequate medical care and those alleging inadequate 'conditions of confinement.'" *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Thus "[w]hether one characterizes the treatment received by [a] prisoner as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both," the deliberate indifference standard applies. *Id.* (quoting *LaFaut v. Smith*, 834 F.2d 389, 391-92 (4th Cir. 1987) (J. Powell, retired, sitting by designation)). As to the specific condition of confinement challenged by Haid, there is no doubt that "prisoners have a [constitutional] right to nutritionally adequate food." *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). To prevail on an inadequate diet claim, then, a prisoner must "show that prison officials were deliberately indifferent to his . . . dietary needs." *Id.* Given that Haid's claim concerns the adequacy of his diet in light of his diabetes, it survives if genuine issues of material fact exist as to whether prison officials were deliberately indifferent to his dietary needs as a diabetic.

Though the Court views this question as particularly close, it finds that genuine issues of material fact do exist. The R&R emphasizes Haid's weight loss and his allegation that his diabetic meals were often no different, or immaterially different, from the meals provided to non-diabetic prisoners. *See* Doc. 44, pp. 7, 11. The Court agrees that these two sets of facts are the most pertinent. Haid testified that he lost more than 40 pounds over the course of a couple of months, (Doc. 40-4, pp. 49-51), and information in the record corroborates his weight loss.[2] Defendants suggest that Haid's

---

[2] *See* Doc. 40-2, p. 4 (listing Haid's weight at 260 pounds at intake on June 24, 2013); *id.* at p. 82 (listing his weight as 248 pounds on January 24, 2014); *id.* at p. 149 (stating on March 11, 2014 that he was weighed at 203 pounds the week before); *id.* at p. 150 (stating this his weight on March 12, 2014 was 202 pounds); *id.* at pp. 16-17 (orders on March 18 and 19 of 2014 adjusting diet due to weight loss).

weight loss is inapposite because eating foods that one should not eat as a diabetic would cause weight gain, not weight loss. *See* Doc. 45, pp. 1-2 (citing to affidavit of Dr. Lafferty). However, this medical evidence does not account for Haid's testimony that he sometimes did not eat his entire meal because he knew that certain foods were bad for his diabetes. For example, he refrained from eating fruits in heavy syrup and some amount of bread when he was served eight slices per day. (Doc. 40-4, p. 50). Haid also complained of other symptoms possibly in conjunction with his weight loss, such as kidney pain (Doc. 50-4, p. 52), weakness and muscle loss (Doc. 40-2, p. 145), and lethargy (Doc. 40-2, p. 152). The Eighth Circuit has, on at least one occasion, reversed a district court's grant of summary judgment when a diabetic prisoner alleged that improper treatment of his diabetes resulted in weight loss along with other symptoms. *Roberson v. Bradshaw*, 198 F.3d 645, 647-48 (8th Cir. 1999).

The Magistrate Judge was also correct in finding that the content of the diabetic meals provided to Haid raises questions of material fact. From November 27, 2013 through April 9, 2014, Haid consistently lodged complaints about his diet through the jail's Offender Communications Center. *See* Doc. 40-2, pp. 120-152. While some of Haid's complaints related to indigestion caused by certain foods served at the jail, many of them concerned the health effects of the meals offered to diabetics. Haid noted that several of his meals did not materially differ from those served to non-diabetic prisoners, and included foods that diabetics should generally avoid.[3] Coupled with Haid's weight

_____

[3] *E.g.*, Doc. 40-2, p. 120 (noting double serving of noodles; replacing mayonnaise with fruit in syrup or cookies; replacing salami with bologna); p. 122 (diabetic lunch the same as regular dinner, and diabetic dinner the same as regular lunch); p. 125 (diabetics get bologna instead of turkey); p. 133 (diabetics get bread and crumb cake instead of eggs and salsa; day's diabetic diet included 10 slices of bread).

loss during this same time frame, the alleged similarities between diabetic and regular meals create an issue of fact as to whether the meals were adequate to serve Haid's medical needs as a diabetic.

Making this issue a close call for the Court is BCDC's efforts in monitoring Haid's blood sugar. Haid's blood-sugar levels were monitored consistently throughout his stay in jail, *see* Doc. 40-2, pp. 108-115, and the only medical opinion in the record suggests that his blood sugars were "very well controlled," Doc. 40-6, p. 2. This fact certainly supports Defendants' contention that the diabetic meals were medically adequate, but given Haid's aforementioned evidence, it does not make that contention an undisputed fact. *Cf. Ingrassia v. Schafer*, --- F.3d ----,  2016 WL 3228409 (8th Cir. June 13, 2016) (affirming district court's denial of qualified immunity where plaintiff's weight loss of 14 pounds in three months left him within the normal BMI for his height).

The Court believes the questions of fact identified above are material in light of the deliberately indifferent legal standard. There is no question that maintaining a proper diabetic diet is an "objectively serious medical need." *Plemmons*, 439 F.3d at 823. There is also no question that prison officials actually knew that Haid was diabetic, and knew the risks related to providing inadequate nutrition to diabetics. *E.g.*, Doc. 40-2, p. 5 (Benton County Jail Medical Questionnaire). Despite the jail's monitoring of Haid's blood sugars, his four-plus months of notifying the jail about his dietary issues, along with his dramatic weight loss during the same time, raise an issue of material fact as to whether the jail was deliberately indifferent to his dietary needs as a diabetic. Accordingly, the Court adopts the R&R's findings as to Haid's official capacity diabetic diet claim.

### B.   Haid's Right to Privacy Claims

Haid alleges that Deputy Pitts violated his constitutional right to privacy by refusing to leave the room with another inmate during a doctor's appointment in which Haid was at times nude from the waist down and openly discussed his medical history. He also contends that Nurse Watson and Deputy Thompson violated his constitutional right to privacy by disclosing one of his medical conditions to another BCDC employee. The R&R found that Haid's claim against Deputy Thompson was too tenuous to proceed, and the Court agrees.[4] However, the R&R also found that Haid's claims against Nurse Watson and Deputy Pitts could proceed, as they were not entitled to qualified immunity on the issue. On this finding, the Court disagrees.[5]

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The test for whether an official is entitled to qualified immunity includes two prongs. The first is whether, taken in the light most favorable to the plaintiff, the facts

---

[4] Haid's claim against Deputy Thompson is that she told another guard, Deputy Wilkins, about a hydrocele on his testicles. Specifically, Haid alleges that Deputy Thompson learned about his condition from Nurse Watson, and then relayed the information to Deputy Wilkins. However, Haid admits that he was not present for either conversation, Doc. 40-4, p. 48, and has offered no probative evidence that the latter conversation—which creates the basis for his claim—ever happened. Even assuming that Deputy Thompson did divulge Haid's medical information to Deputy Wilkins, moreover, his claim would fail for the same reasons his claim against Nurse Watson fails. *See* this section, III(B), *infra*.

[5] The Court also finds that Haid's Complaint can be construed to state an official capacity claim alleging that Benton County failed to train jail officials to handle private medical information. The R&R did not address this claim, but the Court now finds that it too should be dismissed because Defendants did not violate Haid's privacy rights.

8

show that the official's conduct violated a constitutional right. *See Washington v. Normandy Fire Prot. Dist.*, 272 F.3d 522, 526 (8th Cir. 2001). The second is whether the constitutional right was clearly established. *Id.* A court may address these questions in either order. *See Pearson*, 555 U.S. at 236.

The R&R began its qualified immunity analysis by finding that courts have recognized a clearly established "constitutionally protected right of individuals to avoid disclosure of personal matters" that encompasses medical information. (Doc. 44, p. 15). It then found that this right extended to inmates, subject to exceptions for administering care and for penological concerns. *Id.* at 16. Because the privacy right was clearly established, and because it extended to inmates, the R&R concluded that Haid had shown that Nurse Watson and Deputy Pitts violated his privacy rights. But this line of reasoning moves the qualified immunity goalposts too far back. By focusing the "clearly established" inquiry on the general right to privacy in medical information, and then finding that the right extended to inmates, the R&R avoided the crucial question of whether the extension to inmates was clearly established. It also avoided the subsequent question of whether that clearly established right extended so far as to bar Nurse Watson's and Deputy Pitts's conduct; or, instead, whether that conduct was consistent with legitimate penological concerns. Indeed, the Supreme Court has cautioned against adopting a broad conception of what constitutes a clearly established right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (declaring that the clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition"), *abrogated in part on other grounds*, 555 U.S. 223 (2009). It has more specifically instructed that for a constitutional right to be clearly

established, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted).

An analogous Eighth Circuit case involving Fourth Amendment privacy rights in the jail context provides a concrete example of the proper application of these principles. In *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002), the female plaintiff sued several jail personnel after she was—while extremely intoxicated and unruly—stripped naked in the presence of male jailers and restrained in a padded room and then on a restraining board. Rather than generalizing about an inmate's right to avoid nudity in front of guards of the opposite sex, the Eighth Circuit looked to the specific conduct underlying Hill's accusations. In doing so, the *Hill* Court could not say "that it is a violation of a prisoner's Fourth Amendment privacy rights for a male guard to require a loud and violent female prisoner to disrobe in his presence before placing her in a padded cell for her own safety," or to use "male guards in an otherwise justified transfer of an unruly and naked female prisoner." *Id.* at 903. On Hill's third claim, the court found that strapping her to a restraining board while nude was a Fourth Amendment violation, but declined to find that the jailers' actions were clearly established to be unconstitutional. Instead, it distinguished the "general statement of law" established by several cases that "prison officials must balance an inmate's right to privacy with the security needs of the institution" from the more exacting question of whether the jailers specific actions were clearly unconstitutional. *Id.* at 904. Addressing that more exacting question, the court held that it was not clearly established that "a highly intoxicated, loud

and violent prisoner could not constitutionally be restrained naked outside the view of all but a small number of guards." *Id.* at 905.

Applying the methodology mandated by the Supreme Court and the Eighth Circuit, the Court finds that Nurse Watson's and Deputy Pitts's actions were not clearly established to be unconstitutional. The Court assumes for purposes of this inquiry that a *general* right to privacy in medical information exists and is clearly established as applied to inmates. A generous reading of the case law leads to this conclusion. In *Whalen v. Roe*, 429 U.S. 589 (1977), the Supreme Court discussed the constitutional right to privacy in terms of, in pertinent part, an interest "in avoiding disclosure of personal matters." *Id.* at 599. The Eighth Circuit recognized this right in the context of medical information in *Cooksey v. Boyer*, but found that the right was not violated where the disclosure of medical information did not involve "shocking degradation or an egregious humiliation." 289 F.3d 513, 516 (8th Cir. 2002). The Circuit then implicitly recognized the general right to privacy in medical information in the prison context in *Beers v. Stockton*, when it found that a prison nurse's disclosure of certain medical information did not violate a prisoner's privacy rights. 2000 WL 1839535, *1 (8th Cir. 2000) (unpublished per curiam).

However, a prisoner's general right to privacy in medical information, even if clearly established, is subject to broad exceptions for legitimate penological interests. *See Seaton v. Mayberg*, 610 F.3d 530, 534 (9th Cir. 2010); *Doe v. Delie*, 257 F.3d 309, 311 (3d Cir. 2001); *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999); *Moore v. Mabus*, 976 F.2d 268, 271 (5th Cir. 1992); *Harris v. Thigpen*, 941 F.2d 1495, 1515 (11th

Cir. 1991). The Court finds that, without question, both Nurse Watson and Deputy Pitts acted well within the scope of BCDC's legitimate penological interests.

Haid alleges that Nurse Watson disclosed his private medical information to Deputy Thompson after Deputy Thompson inquired into why he was on bedrest. Thompson then relayed to Haid that Nurse Watson said something to the effect that Haid should only be feeling discomfort, not pain, in his condition. This exchange did not violate Haid's constitutional right to privacy. It was within BCDC's legitimate penological interest for Nurse Watson to tell Deputy Thompson why Haid was on bedrest. Guards may need to administer emergency medical care, take precautionary measures to prevent the spread of communicable diseases, monitor an inmate more closely, or assist medical personnel in evaluating the legitimacy of an inmate's medical complaints.[6] For them to fulfill these legitimate penological interests, guards must often be informed about the health conditions of the inmates who they monitor.

Haid's claim against Deputy Pitts revolves around a January 24, 2014 appointment with Dr. Zimmerman, a urologist. Viewing the facts in the light most favorable to Haid, Deputy Pitts accompanied him and another inmate, Mark Morris, to Dr. Zimmerman's office. As Dr. Zimmerman was set to begin his examination of Haid's testicles, he suggested that Deputy Pitts and Morris leave the room. Deputy Pitts refused, and remained in the room with Morris. This made Haid, who was exposed from

---

[6] Haid admits, for example, that some prisoners fake health issues in order to get moved from regular meals to special ones because "the food sucks." (Doc. 40-4, p. 54). Since medical staff cannot consistently monitor inmates, providing information about their medical claims to guards can help establish the validity of those claims. An inmate who complains of stomach pain to a nurse, then goes back to his cell and does sit-ups all day, is more likely to be caught in his fib if the line of communication between nurse and guard is open.

the waist down, very uncomfortable. It also allowed Deputy Pitts and Morris to see a computer monitor and hear conversations containing information about Haid's medical history.

The Court can certainly imagine scenarios where prison personnel would lack a legitimate penological interest to be present—particularly with another inmate—during a doctor's visit. Perhaps more accurately, in some instances, an inmate's privacy rights may so outweigh any penological interest that a constitutional issue arises. In the instant case, however, Deputy Pitts's refusal to leave either Haid or Morris unsupervised was closely related to legitimate penological safety concerns. Had Deputy Pitts left the room with Morris, he would have been leaving Haid at least somewhat unsupervised. Had he stayed in the room with Haid, but ordered Morris to leave the room, he would have been leaving Morris unsupervised. In most instances, the constitution does not require a prison guard to leave an inmate unsupervised during a doctor's visit. *Cf. Franklin v. McCaughtry*, 110 F. App'x 715, 719 (7th Cir. 2004) (unpublished) (rejecting prisoner's argument that receiving medical treatment in front of staff members was constitutionally offensive); *Wery v. NDDOCR*, 2012 WL 4090778, at *15 (D.N.D. Aug. 28, 2012), *report and recommendation adopted*, 2012 WL 4090681 (D.N.D. Sept. 17, 2012) ("Having a guard present at a nursing assessment to ensure the safety of medical personnel is related to a legitimate penological purpose."). This is particularly so when the inmates are awaiting trial on potentially violent charges. Haid was in jail awaiting trial for third degree domestic battery, residential burglary, and rape. (Doc. 40-2, p. 6). The Court will take judicial notice that Morris was in jail awaiting trial for failure to register as a sex offender. *See Morris v. Cradduck*, 14-cv-5096-PKH-ELS, Doc 67-2, pp. 2-7.

Lastly, the Court is cognizant of the personal nature of Haid's doctor's visit. Being exposed from the waist down and examined by a doctor in front of a fellow inmate and a guard is undoubtedly an uncomfortable situation. But as courts have often recognized, the privacy expectations held by free members of society are at times incompatible with the realities of incarceration. Having to sometimes be nude around guards and fellow inmates is no exception. *E.g.*, *Timm v. Gunter*, 917 F.2d 1093, 1102 (8th Cir. 1990) (holding that privacy intrusions to male inmates resulting from female guards surveilling them while showering or using the toilet were "outweighed by institutional concerns for safety and equal employment opportunities"); *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (holding that policy of strip searching all arrestees before sending them to general population was constitutional); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988) (upholding use of frequent strip searches in maximum security prison against prisoner's privacy challenge). Though Haid's situation was uncomfortable, it was not unconstitutional.

For the reasons discussed in this section, Haid's individual capacity claims against Deputy Thompson, Nurse Watson, and Deputy Pitts must be dismissed.

## C.    Haid's Denial of Medical Care Claims Against Nurse Watson

Lastly, Haid's denial of medical care claims derive from Nurse Watson's delay in providing him with an additional or upgraded sleeping mat, and Nurse Watson's refusal to schedule a surgery to address a hydrocele on his testicles. The R&R advises the Court that genuine issues of material fact preclude summary judgment as to these individual-capacity claims. The Court disagrees with the R&R with respect to the sleeping mat issue, and agrees with the R&R with respect to Haid's hydrocele.

### 1.   Haid's Back Condition Did Not Create a Serious Medical Need for Prompt Access to a Better Sleeping Mat

Haid began requesting an additional sleeping mat on June 27, 2013, stating that he needed the additional mat because of his back pain. (Doc. 42, p. 44). Haid injured his back in 1999 during a work-place incident. (Doc. 40-4, p. 15). He received periodic injections for approximately three years, and was thereafter prescribed painkillers to manage the condition. *Id.* at 17. In 2005, Haid stopped taking pain killers and began dealing with his back pain by taking Tylenol, Aleve, and other over-the-counter medication. *Id.* at 18. He continued this method of pain-management up until the time he was incarcerated.

Haid requested a second mat again in July and in August, and his request was denied both times. (Doc. 42, pp. 45-47).[7] On August 22, 2013, Haid complained that his current mat was aggravating his back condition, and four days later requested a doctor's call about his back and obtaining a medical mat. (Doc. 42, pp. 46-47). Haid was eventually provided with an extra mat on November 22, 2013 (Doc. 42, p. 32), and was provided with a medical mat on December 23, 2013 (Doc. 40-2, p. 116). On February 10, 2014, Haid complained that his mat caused him to develop a blood clot. (Doc. 42, p. 58). Even though he already had a medical mat, he wanted an even thicker "trustee" mat. *Id.* at 58, 62. Over the next several months, the record shows that Haid's mattress

---

[7] Though it does not affect the outcome of the case, a fair reading of the communications between Haid and Nurse Watson suggests that Haid was at least partially responsible for his initial inability to obtain a second mat. On July 1, 2013, Nurse Watson indicated that there "would be a charge"—which in context appears to refer to a requirement that Haid have a doctor's consultation before being granted a better mat. Rather than follow this instruction, Haid insisted that Nurse Watson contact his personal doctor to verify his back condition. Had Haid followed BCDC's apparent procedure, he may very well have had more success in obtaining his requested mat early on in his stay.

situation was somewhat in flux, but at almost all times he had either a single medical mat, two medical mats, two regular mats, or a single trustee mat. *Id.* at 59-68.

Even considering these facts in the light most favorable to Haid, his denial of medical care claim with respect to his mattress fails. The Court does not believe that Nurse Watson's initial denial of a medical or trustee mat to Haid constitutes the deliberate disregarding of a serious medical need. *See Smith*, 919 F.2d at 92. This conclusion is in line with a factually similar case recently decided by the Fifth Circuit. In *Davis v. Young*, 624 F. App'x 203 (5th Cir. 2015) (unpublished), the plaintiff was involved in a car accident that caused him neck and back pain. *Id.* at 204-05. A physician recommended that he be given an extra mattress and pillow, but the prison nurse denied him those accommodations. The Fifth Circuit concluded that the facts did not plausibly establish that the plaintiff "faced a substantial risk of serious harm due to the denial of an extra mattress and pillow, or that [the nurse] knew of and disregarded such a risk." *Id.* at 206; *see also Koos v. Corr. Corp. of Am.*, 63 F. App'x 796, 797 (6th Cir. 2003) (unpublished) (denial of special mattress for back pain did not constitute deliberate indifference to medical needs). In extreme cases, the failure to timely provide a requested medical mattress may constitute deliberate indifference to a serious condition. *E.g.*, *Rutherford v. Med. Dep't of Dep't of Corr.*, 76 F. App'x 893 (10th Cir. 2003) (unpublished) (long-term denial of medical mattress after plaintiff was diagnosed with nerve damage that required surgery and was consistent with extreme pain constituted deliberate indifference to serious medical needs). But Haid's case is not an extreme one. He was able to manage his back pain with only over-the-counter

medication for the eight years prior to his incarceration. His back condition did not create a serious medical need for prompt access to a better sleeping mat.

### 2.   Nurse Watson was not Deliberately Indifferent to Haid's Medical Needs Related to His History of Blood Clots

In addition to his back pain, Haid also claims that his thin mattress caused him to develop a blood clot in his leg. A medical record from December 12, 2013 reflects that Haid was diagnosed with chronic deep venous thrombosis (DVT) in 2011.[8] (Doc. 40-2, p. 41). Though Haid did not disclose this condition on his medical questionnaire form at intake (Doc. 40-2, p. 5), he maintains that he told Nurse Watson of this condition during his first nurse's call. (Doc. 42, p. 58). Even assuming the medical feasibility of a thin mattress causing a blood clot,[9] to establish a constitutional violation,[10] Haid must show that Nurse Watson "actually knew of but deliberately disregarded" his serious medical needs. *Plemmons*, 439 F.3d at 823. Haid has not offered any evidence that Nurse Watson actually knew that Haid needed a thicker mattress to prevent a blood clot from forming, let alone that she deliberately disregarded that need. Rather, the record shows that Haid did not complain about his mattress in terms of a risk to his blood circulation until the clot had already formed. (Doc. 42, p. 58). The record, moreover, indicates that

---

[8] "Deep vein thrombosis (DVT) occurs when a blood clot (thrombus) forms in one or more of the deep veins in your body, usually in your legs." Mayo Clinic, http://www.mayoclinic.org (search "deep vein thrombosis") (retrieved June 2, 2016).

[9] Dr. Lafferty called the idea that a thin mattress could cause a blood clot "an absurd rationale," (Doc. 45-1, p. 2), but Haid has offered evidence that two doctors and a nurse suggested to him that a thin mattress could cause a blood clot. Doc. 40-4, pp. 37-38; Doc. 42, p. 85.

[10] Haid would also have to defeat Nurse Watson's qualified immunity.

Haid already had been sleeping on a medical mat (or two mats) for several months before his clot formed. (Doc. 42, p. 32; Doc 40-2, p. 116).

After the clot formed, Nurse Watson promptly scheduled a doctor's visit, which took place within two days. (Doc. 40-2, p. 87). Dr. Lafferty performed an ultrasound at the appointment, and adjusted Haid's medication regime to thin out his blood. (Doc. 40-6). Haid also had a follow-up appointment with Dr. Lafferty on March 14, 2014. *Id.* During this time, Haid was allowed to sleep on two medical mats "for several months." (Doc. 42, p. 62). Given that Haid was already sleeping on a medical mat for months before his clot formed, and given Nurse Watson's prompt response to the clot, she did not actually know of but deliberately disregard Haid's serious medical needs.

### 3. Questions of Material Fact With Respect to Haid's Hydrocele Preclude Summary Judgment

The Court lastly addresses Haid's claim that Nurse Watson failed to provide medical care for a hydrocele on his testicles. The R&R found that this claim should survive. The Court agrees with this conclusion, and finds that at least four questions of material fact preclude qualified immunity and summary judgment. First, the Court finds a question of material fact as to the amount of pain the hydrocele caused Haid. Second, the Court finds a question of a material fact as to whether failure to timely repair a hydrocele can lead to long-term nerve damage. Third, the Court finds a question of material fact as to who cancelled Haid's surgery. Fourth, the Court finds a question of material fact as to the reasons for cancelling and not rescheduling Haid's surgery.

The first two of these questions—Haid's pain and the possibility of permanent nerve damage—go to whether the surgery to repair his hydrocele was a serious medical need. It is clearly established that the outright denial of a *medically necessary*

18

procedure violates the Eighth Amendment. *See Roe v. Crawford*, 514 F.3d 789, 800-01 (8th Cir. 2008) (discussing the distinction between necessary and elective procedures for Eighth Amendment purposes); *Johnson v. Bowers*, 884 F.2d 1053, 1056 (8th Cir. 1989), *as modified on reh'g* (Oct. 27, 1989) (plaintiff made a "strong case" of deliberate indifference given that the "need for the surgery appears serious" and denial of surgery will cause "permanent handicap"). This requirement flows naturally from the language of the relevant legal standard: deliberate indifference to a *serious* medical *need*. The Eighth Circuit has, however, expressed significant doubt as to whether the denial of an *elective* procedure could ever create an Eighth Amendment violation. *See Crawford*, 514 F.3d at 798-801 (finding that nontherapeutic abortions were elective procedures that did not constitute a serious medical need).

Even if *Crawford* creates a categorical distinction of constitutional dimension between necessary and elective procedures, determining which category a particular procedure falls into requires a fact-intensive inquiry. Judge Posner articulates this difficulty with his usual precision:

> Medical "need" runs the gamut from a need for an immediate intervention to save the patient's life to the desire for medical treatment of trivial discomforts and cosmetic imperfections that most people ignore. At the top of the range a deliberate refusal to treat is an obvious violation of the Eighth Amendment, and at the bottom of the range a deliberate refusal to treat is obviously not a violation. Where to draw the line between the end points is a question of judgment that does not lend itself to mechanical resolution. It is a matter of determining the civilized minimum of public concern for the health of prisoners, which depends on the particular circumstances of the individual prisoner.

*Ralston v. McGovern*, 167 F.3d 1160, 1161-62 (7th Cir. 1999) (citations omitted). The recognition that this inquiry is ill-suited to mechanical resolution is shared by the Eighth Circuit. In *Johnson*, the court held that "[t]he hospital's gratuitous classification of [the

19

plaintiff's] surgery as 'elective,'" did not "abrogate the prison's duty, or power, to promptly provide necessary medical treatment" to him. 884 F.2d at 1056. The plaintiff in *Johnson* had nerve damage from an old stab wound that, absent surgery, would have left him with permanent diminished use of his left hand. *Id.* Even though the plaintiff was not in pain from the injury, *id.* at 1054, the potential permanence of his handicap made the surgery "elective" in name only. *See also Crawford*, 514 F.3d at 800 (describing *Johnson* as holding that "a *gratuitous* classification of a medical procedure as 'elective' will not automatically remove the prison's responsibility to provide treatment, when that treatment is actually '*necessary*' for the health of the prisoner" (emphasis in original)); *Grundy v. Norris*, 26 F. App'x 588, 590 (8th Cir. 2001) (unpublished) (rejecting denial-of-medical-care claim in part because "of the medical evidence showing that the surgery was elective and the delay was not of great concern").

Shifting attention to the instant case, Dr. Lafferty's categorization of the surgery as "elective" is not determinative for constitutional purposes. (Doc. 40-6, p. 2; Doc. 45-1, p. 2). Instead, the "elective" versus "necessary" or "serious" nature of Haid's hydrocele surgery is dependent on the amount of pain he was in, and the medical consequences of denying him surgery. A hydrocele is a "collection of fluid in the membranes surrounding the testicles" that is "typically painless and [does] not cause harm to the testicles." (Doc. 40-6, p. 1). However, Haid told Nurse Watson that his hydrocele was causing him pain as early as November 14, 2013, and that pain apparently persisted and intensified throughout his time in jail. (Doc. 42, pp. 49, 50, 70-72; Doc. 40-2, p. 8, 132, 157; Doc. 40-4, p. 45). Haid also testified that the hydrocele has resulted in nerve damage, and that he now takes medication for the nerve damage. (Doc. 40-4, p. 55, 57-

20

58). Viewing these facts in the light most favorable to Haid, his hydrocele presented a medical need that would not be categorized as elective (i.e. non-serious) for constitutional purposes.

The third and fourth questions—who cancelled Haid's surgery and why it was cancelled and not rescheduled—go to whether Nurse Watson deliberately disregarded Haid's need for surgery. On January 24, 2014, Dr. Zimmerman recommended that Haid have surgery to repair the hydrocele on his testicles. (Doc. 40-6, p. 1). On February 10, 2014, Haid reported that he had a blood clot in his leg. (Doc. 42, p. 58). The R&R states that "when contacted by Dr. Zimmerman's office" on February 18, 2014, to schedule the surgery, "*Nurse Watson* indicated no surgery could be performed because of the blood clot." (Doc. 44, p. 17 (emphasis added)). Defendants object to this narrative and argue that "the decision not to schedule the surgery . . . was made by the physician." (Doc. 45, p. 2). The Court's review of the record, however, unearthed no evidence indicating who made the decision. *E.g.*, Doc. 40-6, p. 2 ("Unfortunately, *it had to be cancelled* due to the fact he required blood thinners . . . .") (emphasis added). This uncertainty constitutes a material question of fact. If Nurse Watson made the decision to cancel the surgery (and to not reschedule it at a later date), then she may have been deliberately indifferent, depending in large part on the basis for her decision.[11]

Turning to that basis, Defendants maintain that Haid could not get surgery because of his dependence on blood thinners. Dr. Lafferty's affidavit declares, "[f]rom a medical standpoint, no surgeon is going to do an elective surgery of any kind . . . on someone while that person is on blood thinners. Further, they are not going to ask the

---

[11] Even if Nurse Watson did not make the initial decision to cancel Haid's surgery, she may have been deliberately indifferent by not rescheduling it for a later date.

patient to stop the blood thinners and risk the clot breaking loose and traveling to his lung . . . ." (Doc. 45-1, p. 2). Haid, however, has submitted two affidavits indicating that Nurse Watson chose not to schedule the surgery for financial, not medical, reasons. (Doc. 42, pp. 32, 39). The second affidavit states that Nurse Watson told him on four occasions that the jail would not pay for his surgery because it was too expensive: once before his blood clot formed, and three times after. *Id.* at 39. Per this declaration, then, the decision to deny Dr. Zimmermann's recommendation that Haid receive surgery to repair his hydrocele was made *before* his blood clot formed. Moreover, Dr. Lafferty's affidavit does not express a medical opinion on whether Haid could have safely discontinued taking blood thinners at some point after his clot resolved to create a window for surgery.[12] Given the questions of material fact about whether the surgery was elective for constitutional purposes, the question of whether Nurse Watson denied Haid's surgery for medical reasons, or instead for other reasons, is also material.

Finally, these questions of material fact preclude entry of summary judgment based on Nurse Watson's qualified immunity. The appropriate inquiry for qualified immunity is whether it was clearly established that a jail must provide surgery to an inmate where a doctor recommends surgery, the inmate is in pain, and a delay or denial of surgery could result in long-term harm. As the cases discussed above indicate, this inquiry must be answered in the affirmative. *See also Brewer v. Blackwell*, 836 F. Supp. 631, 639 (S.D. Iowa 1993) (listing five Eighth Circuit cases and stating that "[f]ederal courts have frequently found that medical needs of prisoners which require surgery

---

[12] In fact, Nurse Watson noted that she would call to reschedule the surgery once Haid's clot resolved, (Doc. 40-2, p. 12), though the record does not indicate whether such a call was ever made.

constitute serious medical needs and when combined with deliberate indifference shown by prison officials constitute an Eighth Amendment violation").

Resolving this case's questions of material fact in the manner most favorable to Haid, there are triable issues as to whether Nurse Watson was deliberately indifferent to Haid's serious medical needs. More specifically, whether Haid's need for surgery was serious based on his pain and the risk of permanent nerve damage, and whether Nurse Watson was deliberately indifferent by cancelling and then not rescheduling the surgery for non-medical reasons. The Court accordingly adopts the R&R's conclusion with respect with Haid's denial of medical care for his hydrocele claim.

## IV.    CONCLUSION

For the reasons stated herein, the Court **ADOPTS** the R&R with respect to Haid's diabetic meals claim, **DECLINES TO ADOPT** the R&R with respect to his right to privacy claims against Deputy Pitts and Nurse Watson, **ADOPTS IN PART AND DECLINES TO ADOPT IN PART** the R&R with respect to his denial of medical care claims against Nurse Watson, and **ADOPTS** the remainder of the R&R. Accordingly, the following claims remain for trial:

- Haid's official capacity diabetic meals claim.

- Haid's individual capacity claim against Nurse Watson related to his hydrocele.

All of Haid's other claims are **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED on this 24th day of June, 2016.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

23